Jacob E. LESTER, Jr., Appellant,

v.

Richard S. SCHWEIKER, Secretary of Health and Human Services, Appellee.

No. 81-1904.

United States Court of Appeals, Fourth Circuit.

Argued March 2, 1982.

Decided July 9, 1982.

Willis A. Talton, Greenville, N.C., for appellant.

Nathan K. Kobin, Trial Atty., Dept. of Health and Human Services, Social Security Div., Washington, D. C. (Stuart E. Schiffer, Acting Asst. Atty. Gen., Washington, D. C., Samuel T. Currin, U.S. Atty., Joe T. Knott, III, Asst. U.S. Atty., Raleigh, N.C., on brief), for appellee.

Before WIDENER, HALL and SPROUSE, Circuit Judges.

SPROUSE, Circuit Judge:

Jacob E. Lester, Jr., appeals from the judgment of the district court upholding the Secretary of Health and Human Services' decision denying his claim for a period of disability and disability insurance benefits pursuant to Title II of the Social Security Act. 42 U.S.C. §§ 401–431, as amended. An Administrative Law Judge ruled on March 13, 1980, that Lester was unable to return to his former work, but could engage in other substantial gainful activity which is available in the economy. After the ALJ's decision became the final decision of the Secretary when adopted by the Appeals Council on August 26, 1980, Lester initiated this action for judicial review pursuant to 42 U.S.C. § 405(g). The district court granted the Secretary's motion for judgment on the pleadings pursuant to Fed.R. Civ.P. 12(c), holding there was substantial evidence to sustain his decision. We disagree, reverse, and remand for award of benefits.

Lester is fifty years of age, married, has a fifth grade education and lives in Stovall, North Carolina. He last worked in July 1973 as a scouring train operator (one who cleans raw wool in a textile mill). He originally applied for a period of disability and disability insurance benefits on August 30, 1973,[1] alleging disability beginning July 26, 1973, due to numerous health problems, including: (1) loss of use of his left arm due to the fusion of his left wrist and loss of use of three fingers on his left hand; (2) limited use of his right arm, due to a shrapnel wound which limits the extension and degree of motion in his right elbow; (3) double vision;[2] (4) shortness of breath and bronchial asthma; (5) an inguinal hernia; (6) arthritic knees; (7) frequent headaches; (8) hearing loss in the high frequencies; (9) mild dragfoot gait disturbance in his left foot; and (10) pain.[3]

Lester testified that after leaving the job at the textile mill he attended a technical

1. His claim was initially denied, and plaintiff requested a hearing. Plaintiff appeared before an administrative law judge (ALJ), who considered the claim de novo and concluded, on April 17, 1975, that plaintiff was not disabled within the meaning of the Act. The ALJ's decision became the final decision of the Secretary when adopted by the Appeals Council on November 24, 1975. Plaintiff initiated an action for judicial review of the Secretary's decision by complaint filed January 23, 1976. By order filed April 27, 1978, the district court denied the parties' cross motions for summary judgment and ordered the case remanded to the Secretary for the taking of additional evidence. After remand, the original ALJ considered additional evidence as ordered by the district judge and eventually made his ruling of March 13, 1980, which is the subject of the present appeal.

2. His right arm and elbow were injured when shrapnel from a mortar shell struck while he was serving in the United States Army in Korea. While still serving in the army, Lester broke both wrists. His right wrist healed properly, but his left wrist did not; it was subsequently surgically fused and, as a result of faulty medical procedures, three fingers of the left hand permanently stiffened in a "claw" position. His right eye was injured when a staple from a machine flew into it while he was working for the mill.

3. Lester's testimony at his first hearing (January 22, 1975) as to his health problems and why he quit working included:

Well, prior to that I had been pushing myself, on, ever since I got messed up in 1967. I'd been pushing myself, and I pushed it just as far as I could go. And I'd come out of there at night, and hurt the rest of the night. And get

high school for two and one-half years studying law enforcement, but had a difficult time keeping up due to his eye injury and headaches, and did not complete the course. In addition, he could not get a position in that field, he said, because of his physical disabilities. He also testified that he went to the unemployment agency in Henderson, North Carolina in 1973 to look for work, but that the people there told him not to come back because he could not be employed as long as he was disabled. Lester sought employment at a couple of places on his own, including Burlington Mills, but

was unsuccessful. At his second hearing, Lester demonstrated he could not handle money very well and stated that he could not handle a cash register easily, nor could he handle jobs that required walking, reading or lifting. Prior to his military service he was a farm hand, and since his discharge was employed in heavy labor; he has never been trained for anything else. He received a 100% disability rating from the Veterans Administration.

The standard of review which we must apply in this case is, of course, well settled.

up the next day, and be hurting, and go back to work hurting. And I just quit.

Well, my arm [was hurting]. Right elbow. I'd come out there at night, and it'd be at a 90° angle, lose all my motion . . . . I lost all my motion. . . . And the safety requirement—the last year or year-and-a-half I worked for Burlton [sic], they required to put safety guards and railings up along the piece of equipment I operated. And the rail was 54 inches. And we had to throw this excess wool or droppings, as they call it, back into the train. And they had that high railing, and I had to reach over it. And of course, it was under my arm. And I had quite a bit of hurting in the chest the last year-and-a-half. Well, I still have it now. But I talked to the doctors, and they said it could come from offside lifting. So I went on with it until up until I quit.

See, I got a shrapnel wound in the right elbow. Well, it just hurts something similar to a toothache. . . . I mean, not as bad now as it was when I was working. I've got some motion now, but I haven't got it all. And when I was working. . . . No motion. I move my arms freely. It was when I was working, it'd lock up. See, that's all the motion I got now, extension. And when I'd come out of there at night, that arm would be like that. I'd have the use of my shoulder and arm. But as far as the extension, I wouldn't have any.

Onliest thing I use the left arm, sir, in maybe push a button with it, the left hand. That's the onliest thing I could do with that.

Well, that's—that's when it come so bad I couldn't work any longer was in '73. It kept getting worse and worse every year.

I have been having severe headaches. [Other problems—my] feet and legs. I mean, naturally, I've had in my record for years. [When I was working, my left wrist bothered me too,]—they bother me right now.

See, I had trouble with both wrists at one time. I broke or sprained—I don't know which —'cause in the company, they wrap them up, tape them up. And I believe it was 1955, I went to the hospital in Panama City, Panama.

And they x-rayed them, and showed that they had been broke. The right one had healed and the left one hadn't. But I get a lot of trouble with this right wrist too. Especially in anything in the line of what I was doing. I was getting pain—having pain from the right wrist at the same time from that elbow—I was working.

Lester also testified at his second hearing on December 12, 1978:

Well, I have a weak right wrist and right arm, and I just worked it until I couldn't go no farther and it played out on me. It would lock up, and the motion I got out of it now, I've lost five degrees in the last five years, and I'm not doing nothing. [I broke them both in 1954—over the years they gradually got worse.]

I have a split vision in my right eye and I wear reading glasses.

[Dr. Finch said that I have arthritis in the knees.] It gets stiff and swells. It's just usual. If I sit in one position they're going to swell. If I walk, they're going to swell and hurt. [My chest hurts.] I have bronchial asthma. I have to take a breathing, a breathing thing at night, it cuts my breath off. [When I took the exam at Dr. Finch's office in August and he asked me to jump up and down on one foot,]—it cracked and sounded like something drying. He told me I lost the high and low range in my hearing and it's nerve damage which I cannot get a hearing aid or a tone aid that could help me.

[I went to the VA in 1973 because of headaches and dizziness.] I've had headaches quite a while. Back in '72, '73, I got to getting them might bad and I still have them. I have them every day. I take Forinal for it. But sometimes it will help it and sometimes it won't. I don't take many of them. When I take them, it makes me drowsy, so I don't take them often. [I've had an injury to my head.] A mortar round hit me and two pieces of fragment remain imbedded in the skull.

I get dizzy [if I turn my head quickly from one direction to another], or standing up quicklike, or bending over. Any sudden move like that, I have headaches.

Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g) provides that "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." And this court has held that "[i]f there is substantial evidence on the record as a whole to support the Secretary's finding we must accept it although we might disagree." *Hayes v. Gardner,* 376 F.2d 517, 520 (4th Cir. 1967).

■ Equally well-settled, however, is that once a claimant has presented a *prima facie* case of total and permanent disability with respect to his normal work, the burden shifts to the government to go forward with proof that he has the residual capacity for substantial gainful activity. *Noe v. Weinberger,* 512 F.2d 588 (6th Cir. 1975). Moreover, the government is required to show more than that other work is available in the national economy; it must prove by substantial evidence that the claimant has the vocational qualifications to perform specific jobs. *Taylor v. Weinberger,* 512 F.2d 664 (4th Cir. 1975). In meeting its burden, the government, of course, must demonstrate that the claimant can work despite the accumulated effect of all of his disabilities. *Dressel v. Califano,* 558 F.2d 504 (8th Cir. 1977); *Hicks v. Gardner,* 393 F.2d 299 (4th Cir. 1968).

The medical evidence at the first hearing consisted of Lester's medical records from the Veterans Administration Hospital in Durham, North Carolina, and the testimony of Dr. Thomas E. Castelloe, an orthopedic surgeon.

The VA hospital's records indicated many visits by Lester over the years, that he complained of constant pain and dizziness for a year and a half before quitting his job in 1973, and that this affected his equilibrium.

Dr. Castelloe testified:

[T]he medical evidence indicates impairment of function of both upper extremities. The impairment of function of the left upper extremity consists of a fusion of the left wrist in a good position with deformities of the fingers consisting of contractures of the fingers so they are held in a flexed position. With this being most marked in the middle, ring and little fingers. And to a lesser extent in the thumb and index finger.

The function of the left elbow, left shoulder is good. And the right upper extremity, the main impairment of function is in the right elbow, with limited motion, with the range of motion existing consisting of a limitation of 45 degrees extension and 10 degrees limitation of flexion.

Then Dr. Castelloe also testified that "locking" of the right arm after heavy use, as described by Lester, was consistent with the medical condition of the right elbow.

The medical evidence at the second hearing consisted of reports of examinations by Dr. C. B. Finch, a general practitioner, Dr. Edwin T. Preston, an orthopedic surgeon, Dr. Donald D. Neish, an internist, Dr. G. T. Kiffney, Jr., an ophthalmologist, Dr. S. M. Freedman, a psychiatrist and neurologist, and an evaluation based on these reports by Dr. Chauncey L. Royster, an internist.

Lester was examined on August 15, 1978, by Dr. Finch. He noted that appellant had a marked imbalance and lack of coordination in eye movements, double vision, and was color blind. An audiogram revealed normal hearing in the low range, but severe deafness in the higher frequencies. Appellant had full range of motion of the knees with some pain caused by arthritis. Total vital breathing capacity was less than 1.8 liters per minute, with normal being greater than 3.6 liters, and respiratory problems prevented the appellant from exerting himself. Dr. Finch stated that appellant could not be gainfully employed because of his double vision and dizziness.

Lester was seen for a consultative examination on February 1, 1979, by Dr. Neish. His findings virtually paralleled those of Dr. Finch. In evaluating Lester's physical capacities, Dr. Neish stated that in an 8 hour work day Lester could sit 3 hours and stand and walk 2 hours; he could lift and carry 10 pounds frequently and 20 pounds occasionally; he could use his right hand for simple grasping and fine manipulation and

limited pushing and pulling, but could use his left for none of these; he could use his right foot for repetitive movements, as in operating foot controls, but could not use his left foot in that manner; he could occasionally bend, squat, crawl and reach above shoulder level, but never climb; he was mildly restricted in activities involving unprotected heights, being around moving machinery, exposure to marked changes in temperature and humidity, and driving automotive equipment; and that Lester's pain was moderate.

Lester was also seen for evaluation on February 2, 1979, by Dr. Preston. Dr. Preston testified that Lester could manage sedentary work which would allow him to use his right hand for gross task, but stated that his estimation was based entirely on Lester's muscular-skeletal limitations. He also stated Lester has a 90% permanent disability of his left hand and wrist and a 25% permanent disability of his right upper limb. Dr. Preston conducted a physical capacities evaluation in which he found that Lester could sit six hours during an eight-hour work day, could stand one hour and walk one hour during such eight-hour period; he could lift or carry up to 10 pounds frequently, up to 20 pounds occasionally, and anything above 20 pounds, never; he could use his right hand for simple grasping and fine manipulation, but not for pushing and pulling, and he could use his left hand for none of these; he could use his feet for repetitive movements as in operating foot controls; he could bend and squat occasionally, but could not crawl, climb, or reach above shoulder level. Dr. Preston further found that Lester should not drive automative equipment and he rated Lester's pain as mild.

Dr. Kiffney examined Lester on February 13, 1979. He noted that his visual history reveals that Lester has noted blurred vision and occasionally double vision out of the right eye and this is for the past couple of years.

Dr. Freedman examined Lester in June, 1979. He reported Lester's history and in response to a telephone call from the ALJ,

advised him that Lester's headaches were not from a demonstrable neuerological problem.

Dr. Royster, medical adviser to the Secretary, testified at the second hearing. He never examined Lester, but based on a review of the above reports, he stated:

The historical evidence of repeated injuries to both upper extremities is confirmed by documented evidence of permanent abnormalities of the left hand and right elbow. The result is visible swelling of the right elbow with flexion from 65–105°, a normal right shoulder and hand, with no pain on motion. The left hand is fixed in flexion and slight motion of the finger is the only motion possible and there is decreased sensory perception beginning at the wrist and involving the entire hand.

Objectively, on consultative orthopedic and medical surveys some degenetive [sic] changes are present in both knees without interference with function.

Audiometry testing disclosed a decrease in the higher ranges of hearing in both ears but normal in the ordinary tones.

History of shortness of breath for eight or nine years has been followed by Dr. Finch in Oxford, North Carolina, with findings by him and Dr. Neish on consultative examination of decreased breath sounds and scattered wheezes throughout both lung fields.

Dr. Royster summarized Lester's impairments as: (1) fused, immobile left wrist and hand, post traumatic, stabilized; (2) contracture of right elbow, partially fixed in flexion with minimal flexion and extension; (3) age related decrease in distant vision of right eye correctable by glasses; (4) minimal degenerative arthritis of knees, not limiting function; and (5) chronic obstructive pulmonary disease with mild decrease in vital capacity and marked decrease in sustained ventilatory demand.... asthmatic component would be significant in occupations where exposure to dust and fumes would be present.

Dr. Royster, responding to a question concerning the limitations of these abnormalities on functional ability, stated that:

He cannot use his left hand for fine manipulation or grasping objects, nor can he use his hands and arms in pulling and pushing. He can sit for 4–6 hours, stand and walk for 1–2 hours. He is able to lift up to 10–15 pounds repetetively [sic]. He is not able to crawl or climb or effectively reach above the shoulder. He should avoid moving machinery and exposure to dust and irritative fumes and gases. Because of decreased pulmonary function rapid walking on inclines would be prohibited.

He is able to function in a position requiring sedentary activity or light work, involving manipulative procedures with his right hand. There is no objective evidence of sufficient impairment of function of vision or hearing to preclude activity as permitted by the above limitations.

After reviewing Dr. Royster's report, Dr. Finch provided a letter on February 21, 1980, in which he commented on Dr. Royster's report as follows:

1. The patient cannot go through a normal range of motion with right shoulder (limited to a 90 degree angle of extension), right elbow (limited to 100 degree angle—very abnormal carrying angle), and right wrist (and 90% of normal mobility). Also no mention is made of the fact that any use, such as simply driving 6 miles a day, produxes [sic] swelling, pain, and increased limitation of motion in these areas. Repeated stooping or just walking a little as ½ mile causes pain and discomfort in the knees (definitely limiting).

2. There is no mention of the imbalance of extraocular muscles coordination that results in double vision.

3. The patient's chronic obstruction pulmonary diseases is severely worsened by asthma very frequently and requires almost constant medications. At the time of the pulmonary function test reported in this letter [Dr. Royster's] he was on maximum therapy with aminophyllin and using a metaperel inhaler—these test would have been different if he were not on these medications at the time of testing.

In conclusion, it is my professional opinion in spite of so called figures, etc. that this man is totally disabled from gainful employment with his disabilities and limited education.

Subsequent to the initial hearing, but prior to his initial decision, the ALJ submitted a hypothetical question to Dr. R. H. Ballantyne, a vocational expert, in which he assumed that Lester was in his second semester leading towards graduation at a technical high school, that he was alert, cooperative and could communicate well, that he could drive a car, assist his wife in household chores and enjoyed reading. Basing his answer on the ALJ's assumptions, the vocational expert then listed a number of sedentary occupations available in the economy which Lester could perform.[4] There was no testimony from Ballantyne or any other vocational experts after the remand.[5]

The ALJ found that Lester's impairments prevent him from performing work activity requiring lifting of items weighing in excess of twenty pounds, performing manipulation with the left hand, or working in an atmosphere requiring exposure to significant levels of respiratory irritants, but that

4. These occupations included: cashier in a cafeteria, self-service gasoline station and amusement center; motel clerk; or dispatching transportation vehicles. The expert also listed jobs such as an electric or water meter reader, watchman, mail clerk and filing clerk based on his assumption that there was no major limitation with reference to standing or walking.

5. The ALJ's final decision was rendered after the regulations, 20 C.F.R. §§ 404.1501–.1539 &

Apps. 1–2 (1980), were promulgated authorizing the utilization of the "grids" for purposes of determining ability to perform work in the economy. There was no reference to them in the ALJ's decision. This may have been due to the environmental restrictions imposed on Lester's ability to work by his respiratory ailments or because he does not have the ability to perform a full range of sedentary work.

he retains the capacity to stand, walk, or sit throughout a work day, lift up to 20 pounds frequently, and perform fine and gross manipulation with the right hand. The ALJ then stated that while Lester is prevented from returning to any of his past work, he retains the functional capacity to engage in substantial gainful activity in any of the jobs outlined by Dr. Ballantyne, see footnote 4, supra.

Based on these findings, the ALJ recommended that Lester was not entitled to a period of disability or disability insurance benefits under sections 216(i) and 223(a), respectively, of the Social Security Act.

There is not substantial evidence to support the ALJ's finding that Lester could sit, stand or walk for an eight hour day. Only Dr. Preston stated that Lester could sit, stand or walk for a continuous eight hour period and his estimation was based entirely on Lester's muscular-skeletal limitations. Dr. Neish stated that in an eight hour day, Lester could sit 3 hours and walk 2 hours. Dr. Finch stated that he was not capable of working eight hours a day, and Dr. Royster stated only that he could sit for four to six hours and walk one to two hours. Nor is there substantial evidence to support the ALJ's finding that Lester can lift 20 pounds frequently. Drs. Neish and Preston both found that Lester could lift and carry 10 pounds frequently but 20 pounds only occasionally. And Dr. Royster found that Lester could lift only 10 to 15 pounds repetitively.

■ We also find that there is not substantial evidence to sustain the ALJ's finding that Lester could perform any of the jobs suggested by Dr. Ballantyne after the first hearing. Not only was Dr. Ballantyne's assessment based on assumptions made by the ALJ which were not supported by substantial evidence, but there was no substantial evidence to prove that, considering Lester's age, education and work experience, he possesses the vocational qualifications to perform any of these jobs. See 42 U.S.C. § 423(d)(2)(A). It is true that evaluated singly, none of Lester's disabilities would render him incapable of performing many jobs available in the national economy. Considering the accumulative effect of all his disabilities however, together with his age, education and work experience, the evidence demonstrates that he is not only unable to return to his previous work but that the Secretary has not met his burden of showing other available work he can perform.

The judgment of the district court is reversed and remanded with instructions to remand to the Secretary for an award of benefits to Lester from the effective date of his application.

REVERSED AND REMANDED.

WIDENER, Circuit Judge, dissenting:

I respectfully dissent to the majority's reversal and granting of benefits, thus reversing the Secretary's adoption of the ALJ's decision.

Under the majority opinion, the only reason upon which reversal instead of remand can be based is its conclusion that Lester cannot work an eight hour day. The evidence in the record on this point, however, is conflicting. Dr. Preston concluded that Lester could sit six hours, walk one hour, and stand one hour. While other doctors concluded that he could not sit, stand, and walk for that length of time, their conclusions were drawn upon consideration of the same muscular and skeletal problems Dr. Preston relied upon. Because there is substantial evidence in the record to support the Secretary's conclusion, reversal on this ground is inappropriate.

I would, however, remand to the Secretary because the vocational expert did not have before him all of the physical impairments of the claimant. He was not advised of Lester's dizziness and headaches, double vision, osteoarthritis, chronic pulmonary disease, asthma, and mild dragfoot.[1]

Although the vocational expert's testimony was taken at Lester's first hearing, it was relied upon by the ALJ in his second

1. This listing is not meant to be an exclusive one.

decision, which is the one appealed from. The government contends that even if the ALJ's hypothetical question to the vocational expert was incomplete the regulations had changed following the second hearing so that reliance upon the vocational expert was no longer required. The trouble with that argument is that the ALJ did in fact rely upon the vocational expert's previous testimony in his second decision. We must review an administrative decision on the grounds upon which the record discloses the action was based. *Securities Comm'n v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943).

Because the vocational expert did not have all the facts before him regarding Lester's physical impairments, I would remand.